Ladies and gentlemen, our first case for this morning will be Kleen Products against International Paper and others. Mr. Estrada. Thank you Judge Wood, and may it please the Court. Of a claimed $11 billion in damages sought in this class action, 80% are attributable to end products that differ widely from one another, are ordered on a custom basis, and are sold pursuant to individually negotiated contracts in different parts of the country. There is no model on the table that could prove on a class-wide basis a causation between the alleged collusion and any impact on these products. Indeed, the models that the plaintiffs have tendered do not prove any impact, any causation, even as between the alleged collusion and the prices of container board. But these are all direct purchasers. Yes, there is no Illinois brick issue. And the products are all made from this container board, the liner board with the corrugated material in between. Yes. So I think that's what the plaintiffs think, however it's folded, so to speak. As long as there's a direct purchaser, that's a way of conceptualizing the market. If you had an oil conspiracy and everybody was buying directly from the oil producers, it wouldn't matter that you could use oil to make lots of different things. But you would not usually say that oil and refined gasoline are in the same geographic and product markets. And part of the issues here is that market analyses are being offered that sort of assume a national market for all products that even their experts concede does not exist, because as to finished products, the carriage cost makes it prohibitive to send them, say, more than 100 to 150 miles. But the fundamental problem with the analyses is not that the theory might not be possible in the extreme abstract. It's that the models that they have placed on the table do not address any relevant question. But are you focusing on relevant markets so much, or are you focusing on your theory that the plaintiffs' experts haven't shown common activity among the allegedly conspiring companies to raise the price of this container board? We, of course, dispute the allegation of pollution. We think that a fair look at this market would have you looking at just what you saw in the text messaging case. But for purposes of this appeal, we assume that that question could be decided on a common basis. You do. I mean, because obviously, as you'll recall, text messaging, based on the original record, we held that more process had to go forward. Then when the record was filled out in the second text messaging case, we concluded that there was nothing to show anything but oligopolistic interdependence. Sure. There was a summary judgment in the second case and a motion to dismiss. In the earlier one, I think class certification in that case was actually stipulated to, and so it was never an issue before this court. But the problem here is the one that this court identified in Marshall Clinic, which is to say if you have a model that purports to measure the effects of illegal conduct, you have to at least purport to control for market forces. And every salient factor, as this court said in Marshall Clinic, that could have affected what's going on here. Here, both experts conceded that they were not trying to do that. Harris expressly conceded that over the six-and-a-half period of this conspiracy, which spanned from 2004 through the Great Recession, he had made no effort to account for supply and cost factors. Although he conceded that some of these price announcements were probably affected and or based on cost factors and market factors. I'm wondering if you're taking that out of context because he also, I'm talking about Dwyer right now, Dr. Dwyer, goes through a process that your experts criticized, but he goes through a process in which he tries to include various factors like cost of inputs, like inflation, like other things, and then gives the conspiracy dummy variable whose value could be zero if there was no effect from any alleged conspiracy or if there was no conspiracy, whose value could be all the way up to one if it was a highly explanatory variable. I'm sorry. No, go ahead. It is very important to understand in what context they purported to control for supply and demand and in which context they did not. I was speaking on the testimony on impact. There is a purported regression on damages that again purports to control for some of those factors. It is important to understand that even the plaintiffs do not claim that that damages regression could possibly establish impact or individual damages to anyone. Well, I will ask them that because it was my understanding that they said that some of the evidence overlaps and that the impact was in part from there and also in part from the reliance on, let's say, the anchor point of this pulp and paper 42-pound craft number. Let me say this, which I think is extremely important about the damages regression. Before you get to the various and many methodological failings, it is important to understand that the input is prices that have been averaged out, price changes that have been averaged out across all defendants and across all products. You take the prices of floor displays and Kellogg's boxes and the Amazon book cartons and you average out all price changes across all defendants for all of those products for the final category and you come up with an average price change. Once the input is an average of averages in effect, you cannot use the regression to prove anything specifically about individual prices or individual damages. And that's leaving aside all of the methodological failings. I would make just one point in connection with that because I do believe that it is okay to use statistics in the courtroom. They have to uncover what the evidence is and what the facts are rather than to mask it. And what the approach that Dwyer did in his damages calculus is really mask the variability in price changes. But what if there is, though, this general upward push in the prices? I understand that averaging does change if you were focusing on an individual product what you would find. But their evidence seems to show that the trend was upward and that it was done from the emails and the like, it was done in a coordinated way. Well, I think that their argument on that really goes to impact and I will say two things about that. Their attempt to correlate price announcements to the PPW index, which is not a price list contrary to what they say, was based on leaving out all the instances of failed price increases. Why are you saying it's not a price list before you go on? Because it's an analysis of what part of the market is selling. It leaves out, say, sales made internally to our own use and also most of what we do. When you look at price list cases, you are dealing with a commodity that is really completely homogeneous rather than floor displays and Amazon boxes. You are dealing with a price list that is held by the defendant himself and you can see the impact of what that's going to have. But regardless of the role that PPW could play in a market, the point here is that over the six and a half years of the conspiracy, the plaintiffs claimed that there were 15 collusive price announcements. Six failed. If you factor those in. So 60% of them succeed. Right. And by the hypothesis that the plaintiffs offer, but keep in mind that that necessarily means that although Harris said that that meant that there were periods of cartel instability, there is no effort to account for the thousands upon thousands of people who bought during periods of cartel instability. There is no effort to sort of really factor the six failed price increases into their own correlation between the PPW index and the announcements. Could I back up? I mean, the interesting thing to me about the PPW index is that it's a public point of reference. And, you know, cartels, because they have to operate in the shadows, like to have something that's out there in the public. Everybody can see it. It's there. Whether it's an actual price list or whether it's something that's, you know, an analytic index or some other thing, strikes me as somewhat less important for the plaintiff's theory than that it's a public list of what this benchmark product, the 42-pound credit. I am so glad that you asked me this question because I can answer it and also close, you know, the loop on the damages point I was making. I mean, I was making, you know, the point about the averaging of the price changes. Our experts did an analysis on a disaggregated basis for several of the defendants. The analyses are in the joint appendix. I will just hold this chart from page A576, and you can see the variability in the price changes. Zero is over here. And so as many customers suffer price decreases as increases, you get all of that out of the analysis once you average all of that. And that's partly why I say that the damages regressions are useless and mask more than they reveal. This chart actually is in the joint appendix for the purpose of answering the point that you're making just now, which is that because most of this is done on an integrated basis and most of our customers buy end products, what really is going on is that this chart measures the variability in price changes and makes the point, I think both Dr. Carlton and Ordover made the point that because this was sold as end products, it would be extremely difficult to police a, you know, the activity of the cartel because you observe the prices for the end products, and it is impossible for you when you have this level of variability to really be sure that your polluter is actually doing what you think. For most of these charts, as Dr. Carlton pointed out, I'm sorry, as Dr. Ordover pointed out, the variability in the price changes in the end products is higher than the amount of overcharge. And so it would literally be titanically impossible for somebody who is trying to police the cartel to look at the observed prices in the real world and do what you're saying. And so to that extent, the PPW… So why isn't that a fact issue, though? I mean, a lot of your arguments, and this is one of the really interesting things about class actions. I know the Civil Rules Advisory Committee is toiling away on this very subject at this point. Trying to distinguish between those things that would support the certification of a class, on the one hand, and those things that are merits determinations that are made on a class-wide basis, on the other hand, is a difficult task. And it seems to me the district court thought that although these points may be borne out and maybe your clients have a very good point, these are merits points. I will answer it just by pointing out that although the district court extensively described what the plaintiff's experts purport to say, he really did fail in the duty to vet it, as this court's opinions actually look to. And we know after Walmart and Comcast, and certainly in this court's cases in Zabo and the like, that although you may not get into the merits for the merits sake, you have an obligation to get into the merits to the extent of ascertaining that the model being offered actually measures the correct thing. In Parker versus Shell, there was a perfectly good model that would measure the underground benzene contamination, but it did not deal with all of the counterpoints, as is the case here. And if I want to leave you with one, actually with two points, I will say two things. All of these models are not robust. When applied to other parts of the time frame where there was not a conspiracy, they yield answers that could not possibly be. The price comparisons that they did, you know, the before and after, tell you, for example, that 40% or so suffer impact the year before the collusion and after the collusion was over. That shows that to be an impact engine, not a way to measure. Now, the district court looked at all these things, and his answer, this is at page 53, is, look, you know, the fight here is whether the models measure the effect of the collusion or market forces. He believed that was a merits question, and that's why he did not vet the expert evidence. That is Comcast-Walmart error. You have to make sure that the models measure the correct thing before you conclude that this case can reliably be tried as a class action. Thank you, Your Honor. Thank you very much. I take it we're going to hear next from Ms. Pappas. Thank you, Your Honor, and may it please the Court, Elizabeth Pepez for Rock 10 CPLLC. The certification order here is flawed for a further and independent reason that flows directly from the application of settled circuit law and class certification law to the class claims that the plaintiffs chose to plead against Rock 10 following its discharge from bankruptcy. The bankruptcy discharge order issued in June of 2010, four months before the end of the class period, and to avoid a bankruptcy injunction in these proceedings, the plaintiffs conceded then, as they do today, and this is at pages 61, 65, 67 of their brief, that the class claims as pled require a threshold showing that Rock 10's post-discharge conduct violated the antitrust laws. So can I ask you, I mean, looking at your brief, it seemed to me, and you can explain why this may be wrong, that you were conflating two things. One, the damages issue of joint and several liability, and on the other hand, what the law of conspiracy requires, which are essentially two things. You have to join the conspiracy and you have to be aware of the scope of the conspiracy and sign on to that as well. And I understood the district court to be saying that if the proof showed that Rock 10 never joined, or as he put it, rejoined the conspiracy after the bankruptcy discharge, then there's no post-discharge conduct, Rock 10 is off the hook, no problem. But if Rock 10 did rejoin the conspiracy after the discharge, then you could, then the next question would be, was it aware of the scope of the conspiracy, just under standard conspiracy law? And you might use evidence from whatever period. It's not liability so much as just evidence to prove its awareness. So I think you're exactly right, and maybe I can clarify this in the easiest way through this for purposes of this appeal. I think what Your Honor just said, if I understood it correctly, is exactly correct. The plaintiffs concede and the district court recognized that there has to be a showing of a post-discharge antitrust violation before you even get to joint and several or conspiracy. Exactly, and that would be joining the conspiracy after the discharge. Correct. So what does that mean for class certification? And this is what I would submit it means. That means that to certify this class, you have to have Rule 23 evidence, not just assumptions or allegations. And if you look at the district court's opinion at page 65, he talks about assumptions and allegations of rejoining. But what this court's case is... I thought there was like an e-mail or something saying, well, are we all going to raise price tomorrow? I can't remember quite what it said, but something along those lines. No, I'm glad you raised that. Let's look at the record. So this court's case is, say, straightforwardly, at class, right? You need some proof, evidentiary proof that matches up to liability theory. So what we need for class is Rule 23 proof that there was a post-discharge violation. That means there was an agreement and some impact. We don't approve the whole violation. That's too much. That goes to the other side of the line I was talking about. That it's capable of class-wide proof. So let's look at the record and what did they put in. The record evidence that Your Honor is referring to is at 60 to 61 of their brief. It's text messaging evidence, so it doesn't rise to the level of an agreement. There was a trade association attendance, some follow-the-leader pricing and the like. So we would submit that's not even an agreement. But what I want to... I thought there was a statement too, wasn't there? The evidence that they pointed to is at 60 to 61. They said there were some interest CEO communications under text messaging. It's the same type of oligopolistic conduct that this court held lawful. Well, that may overread text messaging. But if I may, let's give them that. Just to follow on, the last point I really want to focus the court on is that doesn't end the inquiry, right? A post-discharge violation requires some class-wide proof of impact. And the key point I would refer the court to on this is that they don't have that. What they have post-discharge, and I'd refer the court to our brief at page 21 and our reply brief at 4. We cite the Dwyer deposition where he admits he has no evidence of what Your Honor described, the PPW movement. He ascribes a zero value to that in Exhibit 3 of his report. We don't have any impact evidence post-discharge that ties back to this class. But does it have to be post-discharge impact or once you rejoin the conspiracy? I mean, when I think of all the drug conspiracies we see, for example, once you've joined the conspiracy, you're responsible for the acts of your other conspirators even before you joined,  And again, on this record, and it's just a narrow record issue, if you look at page 67 of their brief, they concede that the first thing you need is a post-discharge violation because we have a bankruptcy discharge to put ROC-10 back on the hook. That's what you need. They don't have it on the record. It's just a simple fact-bound record issue here. Okay. Thank you very much. Mr. Panner. This is going to be a long argument. Yeah. Oh, my. Chief Judge Woodard, and may it please the Court. The District Court acted well within its discretion when it determined that plaintiffs had satisfied the Rule 23b3 requirements of predominance and superiority. And with respect to predominance, it's conceded that the issue of conspiracy is subject to common proof and is a common issue. By itself, that provides substantial support for the decision below. But you have to say more, Justin, that there was a conspiracy, it was alleged at the highest levels, therefore, common proof. You have to come forward, I think, with a showing that you could prove the conspiracy that you've alleged. And your opponents suggest that there are just too many products and too many differences among the various defendants to do that. Your Honor, let me go right to that. But I understand that to be an argument that falls within the rubric of their argument about impact. And their argument is that because the market is so varied, the impact can't be shown on a common basis, at least as to the final container board products. They seem to concede impact with regard to the intermediate products. But at least with respect to this issue of variability. But the studies that were done and the empirical evidence that was provided, as well as defendants' own statements and the analysis of the market that Dr. Harris provided, all of those went to support the district court's finding that there was common evidence that would be used to show impact class-wide. And I probably didn't order that in the best way, but let me start first of all with the evidence that comes from the defendants themselves. There was a great deal of evidence that they talked about that showed that they expected that efforts to raise price that could effectively raise the PPW index, for example, would certainly translate through in prices of finished products. There were statements by Temple Inland executives, for example. There were presentations by Smurfit Stone to show that a vast majority of their sales are directly tied to the PPW index. So there was an expression by the defendants themselves that they expected that their efforts to raise prices would in fact have an impact market-wide with respect to finished products as well as intermediate products. So that's one. But if you look at the chart that Mr. Estrada was showing us, my visual of it is that it probably actually does sum to be more on the increased side than on the decreased side. But it's very up and down, and is that the kind of proof that can show, let's say, over time a successful increase in price for these products? It can. And this goes to the other elements of the proof that were provided. So there's the analysis of the market that Dr. Harris provided, and it's completely consistent with this court's cases and with basic understanding of the manner in which markets operate. So he's just saying, as I remember, I didn't read the whole thing, but I certainly looked at it. He's saying, first of all, this market's susceptible to collusion. He's looking at the various aspects of the market. That's been talked about a lot. There are a very small number of players. Demand is relatively inelastic. He talks about several things like that. And he says something about impact, but it's pretty vague, isn't it? I don't think it's vague, Your Honor. He actually says one thing that I think it's fair to say is general and cuts across the market. He says something else that's very specific to the way in which transactions occur in this market. The thing that he says that's fairly general is he says, I understand as an economist that in a concentrated market, if, as has been alleged and he actually looked at the evidence and saw evidence to support it, if there was an agreement to raise prices and that was supported by restrictions on capacity, that would lead to increases in price market-wide. And there's nothing controversial about that. And, again, because the capacity flows downstream to all of the finished products, it was perfectly reasonable for him to say, I look at this market and I understand that if, as I think they'll be able to do, the plaintiffs can prove that there was a conspiracy to raise prices supported by restrictions on output. Well, so your basic case is there are a small number of players. There are restrictions in capacity. They're closing plants down and in other ways restricting capacity during the period of the class at a time when demand is going up. And so you would think that competitive actors in the market would be jumping up and trying to serve the new demand, but they're not. They've got all these emails that say if we close these plants, we can support the price, the price will go up, and they say things like that. Do you need more than that? I mean, do you need to show, I surely do need to show that there is an effect on prices because you're trying to get damages ultimately. Well, I'm not sure we need a lot more than that to show impact, Your Honor. But there is a lot more, and I want to describe some of that. There is the fact that he looked at the contracts in the market and he found that the contracts. The 763 of them or whatever, those are the ones you got in discovery? Yes, Your Honor, and they showed overwhelmingly that the actual transaction prices in those contracts were tied to the published indices. And again, that's not something that ought to be controversial because it's in the defendant's own documents that when the PPW index goes up, price of finished products goes up. I think one of the executives said 100% of the time. But again, that's not all there is. And so there's a question, the variety of products really goes to the question of whether the class is sufficiently cohesive to go forward. And I think in this Court's decision in the Cohen case, for example, it talks about the fact that if you have a class that's defined so that you would think there's lots of people in this class who have not suffered impact, that might be an issue, that might be a problem. And so what did the plaintiffs do to address that issue? They put in the work that Dr. Dwyer did. And Dr. Dwyer did two things. First of all, he showed that when the defendants announced, they were able to move the market as was manifest in the PPW index. So do you agree, by the way, with Mr. Estrada that Dr. Dwyer's proof went exclusively to damages when we're talking about that regression that he ran where he's picking the variables? You know, I think that we may have said something in our brief that suggested that. And so Mr. Estrada can be certainly, it's understandable that he would try to hold us to that. But I actually think we made an error in saying that. And if you actually look at what Dr. Dwyer said, what he said was that my damages estimate corroborates and provides further support for the finding of impact. And so I do think that the proper way to look at his damages study is that it does provide additional evidence to show that there was impact. But to get back to the steps, so he showed through looking at the PPW index and the way that it correlated with the announced price increases that defendants were, in fact, able to move the market. And that's dramatic evidence. Because it's not just that there's an announcement of a price increase and you see a little blip. So why is this different from text messaging too? Where the price of those individual non-packaged text messages did, in fact, go up quite remarkably. And yet we ultimately find that there's not enough to go ahead. Well, the first answer is that text messaging was a case that was not about class certification. It was a case that, in fact, the class was stipulated to there. And there was a summary judgment finding. The facts are dramatically different between the two cases. In text messaging, the price increases were widely spaced in time. There was a great deal of internal evidence with respect to the reasons for that. So without belaboring that, because I think it goes to the issues that will come up at summary judgment, the point is that in this case, what Dwyer was able to do, and again, this is evidence piled on evidence. And understandably, what the defendants try to do in their brief is to try to pick apart the evidence and say, well, this isn't quite enough and it has these problems. And Harris, for example, didn't do an empirical regression. And so now you can forget about Harris. And Dwyer didn't control for certain factors when he correlated the increases in prices with increase in the PPW index. So you can now forget about that. And when he did the damages, that doesn't count for showing impact. But that's not right. And I do want to get to the point that I think is extremely revealing with respect to the cohesiveness of the class. What Dwyer did is he said, if a plaintiff, a member of the purported class, suffered a price increase as a result of one of these price increase events, they have impact. And remember, impact is not damages. Impact is some injury from the violation. And he said, I'm going to look at paired transactions, wherever I can, I'm going to look at paired transactions to see if there was, in fact, an impact on these transactions. And he found that for 92% of the class members, accounting for 99% of the volume, he could find that impact. So there's tremendous... So he extrapolates from the pool that he's working from. And what he says in his report, which is important and which they have never effectively countered, is he says this cuts across all the defendants and all the products. So it doesn't... It's not a situation where they came back and said, well, no, actually, if you study the subset of transactions that involve partitions or displays, you don't see it. They didn't do that. And in fact, when they tried to do it with respect to one product, Dr. Dwyer came back and said, no, you're actually wrong. And you can see the... Even if you break it down that way, you do see the impact with respect to the tomato boxes. So this is a situation where there was a tremendous amount of evidence to back up empirically what, after all, is quite a common sense conclusion, which is that in a concentrated industry, where there is price fixing, where it's supported by a cap on capacity and restrictions on capacity, that you're going to have a market-wide impact where all or nearly all buyers are going to suffer an impact. Let me ask you about aggregate damages, though. Is there a way that the damages could be resolved by more narrowly tailoring the subclasses? It's certainly a possibility, Your Honor, and one of the things that the district judge talked about. This was, after all, what Dr. Dwyer was doing was saying, I am showing you that I can prove damages on a class-wide basis by using a regression that will eliminate, that will control for other economically relevant factors and isolate the impact of the conspiracy with regard to... And he broke it into two general groups of products, intermediate container board products and the final container board products. And he found... He was able to estimate the damages with respect to those products and estimate the damages. Could he or would he at the merit stage calculate the damages using a similar model, comparable model, in a more reticulated way? I don't know the answer to that yet. I don't think he would have to for it to be an appropriate way to prove damages at the merit stage. And so what the district court said is, this satisfies the showing under Rule 23b-3 and if there are reasons to believe that damages need to be done in a way that there may be further litigation over how damages are going to be proven at the merit stage. See, I think this is something that concerns me as well about this because your opponent suggests that there are actually a number of points about the damages proof that are going to be difficult to handle on a class-wide basis so just to tick a few off. Some people have signed releases. Other people have not signed releases. There may be other kinds of defenses pertinent to some people and not to others. And I'll pick up at this point on footnote 5 in the reply brief, which might be a little late to raise this, but footnote 5 suggests that you never proposed issues classes under 23c-4 and thus you've forfeited any such argument. I wonder what you have to say about that and I wonder whether you are actually proposing that this case should be tried as a class with respect to liability but not with respect to damages. We are not proposing that, although certainly the district judge indicated that he would revisit the question of exactly how damages would be proven as is appropriate and so I don't think this court would need to intervene at all with respect to that other than to note that the district judge had found within his discretion. Why wouldn't we be within our rights to say even if liability is susceptible to class-wide procedures, the variation on an individual basis for damages is simply too great to do that. I mean, this is not a situation where, you know, everybody pays a $15 surcharge for the rental car so you just give everybody $15 back and you're done with it. This is a much more complex market. Well, but, Your Honor, what the expert did is to make a reasonable estimate of the overcharges that class members would have suffered on an aggregate basis and that's a perfectly reasonable way and as the First Circuit pointed out, it's inherent in the nature of the class action device that one of the things that's going to happen is that there's going to be a determination of damages for the class. But how does the defendant have the opportunity to raise these individualized defenses when this kind of aggregate number is what's being talked about? Right, I apologize because I skipped over the question that you asked about the contracts and I do want to address that head-on. With respect to that, first of all, the defendant's only pointed to 39 releases and some number, I think about 190 individual contract provisions. So the district judge just carved them out of the class? Say if you signed a release, then you're not in the class? He certainly did not need to in this case because first of all, it was not clear that that would have a substantial impact on the damages that were going to be claimed if they even apply. He found that they would not apply. But he may have been wrong about the dates of the releases. But even if the releases might eventually be shown to apply to some extent, it's completely appropriate for the district judge to entertain motion practice from the defendants to try to define who exactly is and isn't in this class and how would there be limitations on claims with respect to people who would remain in the class. And that's something that the district court found he could administer. That's got to be at the core of a district court's discretion to determine that he has the ability through later motion practice to deal with issues of individualized contractual defenses. So you're saying these individualized defenses could be put in different categories? They could, if appropriate, Your Honor. And the point is that if, for example, there were a need to carve some people out of the class because of that sort of a defense, that's something that can be raised at an appropriate point. But this was brought up very late. The contractual provisions were actually brought before the court fairly late in the process. And again, the actual... We're talking about hundreds of thousands of potential members of the class, and the number who are affected, at least on the evidence that was put before the district court, was really quite a small fraction of those and an even smaller fraction of the potential claims. And so it was entirely appropriate for the district judge to say, this certainly doesn't suggest that the class action mechanism is not superior in this circumstance. Now, your aggregate damages, do you view that as an absolute ceiling on recovery? Well, the way the aggregate damages were calculated, it was a preliminary number. So at the merit stage, the expert will provide it. But what was shown was, here are the total class-wide purchases and the estimated overcharge. So that would be the total class-wide damages, as I understand it. So you don't think there would ever have to be a time that each individual member of the class would have to somehow come up with a number based on that person or company, whatever, own purchases and own market participation? So the allocation of the recovery, that's something that happens all the time in class litigation. And so there would be a claim administration process that would presumably be put into place after recovery. So you think the only place a jury might be involved for the defendants is in the computation of this aggregate? Well, it would depend on how the defendants tried the case and how the case was tried. So there certainly would be no, there would be nothing to prevent the defendants from putting in an alternative damages calculation that would depend on a different approach to calculating the aggregate number or by breaking it down. That would be a merits issue as to how to calculate the class-wide damages. But certainly it's frequently the case that what does occur in these cases is that the defendants will try the aggregate damages and come up with a number that then becomes the class-wide recovery. And then there's a claim allocation process and there's nothing inconsistent with law in that approach. I'm happy to address the separate issue with respect to ROC-10 if that would be helpful. Yeah, I think you should say something about ROC-10 because their view is that to hold them, or at least as I understand it, is to hold them liable for anything that happened before the bankruptcy discharge date would be in contravention of the scope of the bankruptcy discharge. Right, and I think that Your Honor's questions really did, and the other questions from the Court, did get right to the reason that that's not accurate. As I understood what, first of all, the quick answer is that if ROC-10 continued to participate in the conspiracy post-discharge, that's a new legal wrong post-discharge for which they bear the same liability. In their opening brief they said, look, we should be treated like a new entrant. We agree. And a new entrant that had knowledge of the past conspiracy, that entered the conspiracy post-bankruptcy, would certainly be subject to liability for the full scope of the conspiracy and its impact. Reasonably foreseeable to them. Yes, Your Honor. And so that is the same burden that if there's a violation post-discharge, that's the same burden that ROC-10 will bear. And as I understood their brief, what they said is, well, no, you actually don't have to just show a violation of the antitrust laws post-discharge, but you have to show separate impact and separate damages, all occurring post-discharge. And that is inconsistent with core conspiracy law and unsupported by anything in the bankruptcy laws. They would be held... I mean, obviously the full antitrust violation does involve impact and damages, but you're saying, if I'm understanding you correctly, that once you get that agreement in, which is the basis of conspiracy liability, then the impact and damages aspects can be proven by either pre- or post-discharge events. Yes, Your Honor. Correct. Unless the court has questions. Let me ask you this. If the injury... This is on this, so let me make sure I'm understanding what you're saying. So day one, the conspiracy exists, and then a newcomer comes on to the conspiracy day two, and there's no additional injury cause before the lawsuit is brought. You're saying the newcomer is liable. If, as the conditions for liability are under conspiracy law, are satisfied, yeah, sure. And if further injuries were caused, then the newcomer would be liable, and through joint and several liability, he would be liable for damages caused before he joined the conspiracy. That's your view. But if the injury is a separate element of the claim, can we go back in time and find the injury from a time before he joined? The quick answer is yes. Remember, the discharge, what my friend said was, you have to show a violation post-discharge, and I agree. But it's important not to confuse the elements of a cause of action with the violation. The government could prosecute a price fixer irrespective of any impact on anybody. And so if there was an agreement to fix prices, a continuation of a participation in that conspiracy post-June 30, 2010, then ROC-10 violated the antitrust laws. And then the question of what the scope of their liability is for damages is governed by core conspiracy law, and so the impact and the damages flow from the conspiracy, and it's never been the law that an individual defendant can say, oh, well, you know what, I didn't actually join the price-fixing conspiracy until this date, and even though I knew about what was going on before and I joined the conspiracy, I should only have it going forward. This court's decision in Havoco and other cases squarely rejects that version, and that's sort of a defense to liability, to damages liability in this context. Thank you. All right, thank you very much. Mr. Estrada, anything further, or does Ms. Pappes want to go first? Doesn't matter. I think you have about a minute, Ms. Pappes. Thank you, Your Honor. Just briefly, Mr. Panner does not have a single case that supports what he's asking the court to do here, the court is exactly right. He concedes you have to have a post-discharge antitrust violation. Impact is an element. This is not a government case. It is a private antitrust suit. Impact is required, and the FIT cases at class certification, Butler, Comcast, say they had a burden at Rule 23 to connect up their theory against us, which requires an impact finding, with their evidence. They didn't do it. What about the Havoco case? The Havoco case is a joint and several case. It has nothing to do with the intersection of bankruptcy, and that's what's so critical here. What Mr. Panner is asking the court to do, that no court has done, and many have resisted, like travel agent, is say you cannot reach back and borrow. You can't rob Peter to pay Paul. Well, what it says is, a co-conspirator who joins a conspiracy with knowledge of what has gone on before and with an intent to pursue the same objectives may, in the antitrust context, be charged with the preceding acts of its co-conspirators. But what do you do when that's a bankruptcy discharge? That's the question before the court that was not in Havoco at all. There was no bankruptcy discharge, so the question before the court today is, how do you reconcile these two bodies of law? You don't let one run roughshod over the other. You reconcile them by saying, let's apply class cert law. They pled this. They concede that in a private antitrust case, they need impact post-discharge. Their experts disclaimed it. This is Dwyer 3 and 5. And so on that simple basis, we'd say they haven't met it. All right. Thank you very much. Mr. Estrada. Thank you, Your Honor. Justice Breyer likes to say that he'd rather have five circuits on his side. I'm sorry. I sort of fumbled the quote. That he'd rather have Filarita on his side than five circuits on his side. How are we supposed to take that, Mr. Estrada? I think he's been quoted publicly. I mean, it means our view doesn't really matter too much. Well, you know, sadly, from time to time, they do take that view. And what the Arita Treatise says is that if you have a context in which there are individual negotiations in an antitrust case, it is not suitable for class treatment. It cannot be proven, impact can't be proven on a class-wide basis. But Filarita was a man who liked the facts, too. I was a great admirer of his and a friend. And so I think that we don't want to go too far with the quote. Right. He cites for that proposition, you know, the Robinson case from the Fifth Circuit. The New England Canadian export cars case is to the same effect. We cited them both. And what is important about those cases is that the court assumed that there had been an effort to fix something that could actually be determined, which I guess would be the analog of the wanted PPW index, but the existence of negotiations made it impossible to tell the extent of the pass-through. And I... Haggling, they called it. I would ask you to actually look at the exhibits to our opposition to Class III so you can get a flavor of who the people on the other side of the table are. And they are Unilever, Amazon Coca-Cola, Pepsi, Walmart, Kellogg, Maytag, Sara Lee, Anheuser-Busch, General Mills, Heinz, people who can cut a deal and drive a bargain. And so, you know, the assumption that you could sort of assume that everything will be passed on rather than, as our record says, that many clients, even those who had a reference to the PPW index, would refuse to take the increase cannot be accepted by assertion and at face value. May I finish? Please. The other point I wanted to say is that even today the theory has changed and they have taken a concession that I actually think was well taken because it was correct to begin with. But this is an example of the complexity of the issues in this case and how really devastatingly unfair it was that despite multiple requests for a hearing on these complex issues in which we disagree virtually with everything that Mr. Panner said today, this case was ruled on by basically accepting the view of their experts, not mentioning any of the devastating criticisms of ours, and done on the papers, as I quoted you from the opinion, on the apparent assumption that the court's job was merely to figure out whether this was some ballpark science and not whether it proved what it was intended to prove. I thank the court. All right. Thank you very much. Thanks to all counsel. We will take the case under advisement.